U.S. DISTRICT COURT
DISTRICT OF MAINE
PORTLAND
RECEIVED & FILED

2024 DEC 20 P 2: 29

DEPUTY CLERK

UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

Richard F. Stickney III,
Plaintiff,

v.

Southern Maine Healthcare, et al.,
Defendants.

Civil Action No.:

**COMPLAINT**

(With Request for Equitable Tolling and Stay)

## INTRODUCTION

This is a civil rights action brought under 42 U.S.C. §§ 1983 and 1985 and related state law to address systemic violations of the Plaintiff's constitutional and statutory rights. The Plaintiff challenges his prolonged, unlawful detention stemming from egregious procedural violations, including the failure to adhere to state protective custody statutes, the misuse of emergency involuntary commitment procedures, and the lack of investigation into credible allegations of abuse and financial exploitation.

The Plaintiff was unlawfully detained for 74 days without adequate legal basis, subject to involuntary commitment proceedings tainted by procedural defects, a disregard for state-mandated protections, and false or un-investigated diagnoses of mental illness. These actions

violated the Plaintiff's rights under the Fourth, Fifth, and Fourteenth Amendments to the Constitution.

This case also implicates systemic failures to protect the Plaintiff's rights, as the defendants failed to report allegations of ongoing abuse and exploitation as required by state law. Such failures led to the misdiagnosis and mischaracterization of the Plaintiff's mental health and perpetuated his unlawful detention.

The Plaintiff further alleges that the abuse and financial exploitation he continues to endure create an inequitable disadvantage in this litigation. The abuse not only limits the Plaintiff's access to resources but also unfairly benefits the defendants, some of whom may be directly involved in the abuse.

The Plaintiff seeks equitable tolling of the statute of limitations and a stay of these proceedings to allow for the resolution of state court matters, including claims for protection from abuse and harassment, probate disputes, and a Rule 60(b) motion to vacate the void judgment resulting from the unlawful commitment proceedings.

The Plaintiff brings this action in good faith to preserve his claims and to seek justice for the constitutional, statutory, and common law violations that have harmed him.

**JURISDICTION AND VENUE**

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because the claims arise under the Constitution and laws of the United States, including violations of the Plaintiff's rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution and related federal statutes, such as 42 U.S.C. §§ 1983 and 1985.

2. This Court has supplemental jurisdiction over related state law claims pursuant to 28 U.S.C. § 1367, as the state law claims arise out of the same operative facts and are so related to the federal claims that they form part of the same case or controversy.

3. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), as the events giving rise to the claims occurred within the District of Maine, and all or a substantial part of the defendants reside or conduct business in this District.

**PARTIES**

**Plaintiff**

Richard F. Stickney III, is a resident of Saco, Maine. At all relevant times, the Plaintiff was a private citizen whose constitutional and statutory rights were violated by the actions of the Defendants as described herein.

**Defendants**

1. Amanda Hall: MHRT-CSD, affiliated with Southern Maine Healthcare.

2. American Ambulance: A business corporation doing business in Maine. Maine Secretary of State Bureau of Corporations, Elections and Commissions charter number: 20130547 F.

3. Anthony Bock: Medical Doctor at York Hospital.

4. Brian McNeice: Patrolman with the York Police Department.

5. Constance W. Jordan: Independent examiner with Behavioral Health Resources of Maine.

6. Daniel Filene: Medical Doctor at Riverview Psychiatric Center.

7. Edward A. McCarthy, Jr.: Medical Doctor at Southern Maine Healthcare.

8. Elaine M. Madden: Registered Nurse at Southern Maine Healthcare.

9. George Costin: Medical Doctor at Riverview Psychiatric Center.

10. George Davis: Nurse Practitioner at Riverview Psychiatric Center.

11. Janina M. Davis: Family Nurse Practitioner at Southern Maine Healthcare.

12. Jason Grundstrom-Whitney: Substance Abuse Counselor at Riverview Psychiatric Center.

13. Jeanine Ward: Medical Doctor at York Hospital.

14. Jennifer A. Burgess: Registered Nurse at Southern Maine Healthcare.

15. Jennifer M. O'Conor: Nurse Practitioner at Southern Maine Healthcare.

16. Joanna E. Gratton: Orthopedic Medical Doctor at Southern Maine Healthcare.

17. John Grandy: Psychiatrist at Riverview Psychiatric Center.

18. Julie-Anne Blanchard: Appointed counsel for the Plaintiff. Maine Bar Registration Number: 9383.

19. Karen L. Unglaub: Registered Nurse at Southern Maine Healthcare.

20. Keli M. Wedgewood: Licensed Clinical Social Worker at Southern Maine Healthcare.

21. Kevin Henry Mularkey: Medical Doctor at Southern Maine Healthcare.

22. Kiely L. Foley: Psychiatric Mental Health Nurse Practitioner at Southern Maine Healthcare.

23. Leanna Snowman: Licensed Social Worker at Riverview Psychiatric Center.

24. Lindsey Allen: Appointed Counsel for Plaintiff; Attorney with Fairfield and Associates; Maine Bar Registration Number: 5271.

25. Margaret V. Scott: Licensed Clinical Social Worker at Southern Maine Healthcare.

26. Michael Andrick: Licensed Clinical Counselor at Sweetser.

27. Michael P. Cantara: Judge at Biddeford District Court.

28. Nadir Behrem: Doctor of Psychology at Riverview Psychiatric Center.

29. Nathan Pineau: Nurse Practitioner at Riverview Psychiatric Center.

30. Nichole Yeaton: Registered Nurse at York Hospital.

31. North East Mobile Health Services: A medical transport company with corporate offices at 9 Willey Road, Saco, Maine.

32. Olena Zakharova: Nurse Practitioner at Riverview Psychiatric Center.

33. Renee Sarett: Medical Doctor at York Hospital.

34. Ryan Jackson: Medical Doctor at York Hospital.

35. Sarah Street Taylor: Nurse Practitioner at Riverview Psychiatric Center.

36. Tammy Marchand: Clerk at the Maine District Court in Biddeford.

37. Todd Prevatt: Commissioner's Designee, presumably at Southern Maine Healthcare based on records available at filing. Plaintiff reserves right to refine description.

38. York Police Department: Municipal law enforcement agency for York, Maine

39. Town of York, Maine: A municipal corporation organized and existing under the laws of the State of Maine

40. York Hospital: Medical facility involved in Plaintiff's detention.

41. Southern Maine Healthcare: Medical facility involved in Plaintiff's detention.

42. MaineHealth: Parent organization of Southern Maine Healthcare.

43. Richard F. Stickney, Jr.: Plaintiffs father, and a resident of Saco, Maine.

44. John and Jane Does 1-10: Placeholder for individuals whose identities are currently unknown but who may have been involved in the Plaintiff's detention or related actions, including employees or agents of named institutions.

## STATEMENT OF FACTS

### Procedural History of Unlawful Detention

1. On December 21, 2018, at approximately 3:25 P.M., Plaintiff was apprehended by the York Police Department after fleeing the scene of a motor vehicle accident.

2. On December 21, 2018, at approximately 3:57 P.M., Plaintiff was brought to York Hospital under protective custody by Officer Brian McNeice of the York Police Department for medical and psychological evaluation.

3. On December 21, 2018, at approximately 4:42 P.M., the Plaintiff was medically cleared by the emergency room staff.

4. On December 21, 2018, from the Plaintiff's arrival at York Hospital until the Plaintiff's unlawful transfer to Southern Maine Healthcare, the Plaintiff's attending physician was Sadie Carter. It appears from limited hospital records that Sadie Carter made the decision not to discharge the Plaintiff after medical clearance. However, Sadie Carter did not initiate the Blue Paper procedure required under Maine law, possibly because it was actually the responsibility of Officer Brian McNeice under the protective custody statute.

5. On December 22, 2018, at approximately 9:25 A.M., Officer Brian McNeice failed to attain the certificate of examination and judicial review required by Maine law pertaining to protective custody before the expiration of the statutory time duration of 18 hours (34-B M.R.S. § 3862), rendering any subsequent detention of the Plaintiff beyond the 18-hour statutory period procedurally defective, and therefore unlawful, and more specifically, unconstitutional. At this point, the Plaintiff was legally free to leave custody and should have been notified by employees of York Hospital or the York Police Department that he was no longer being held against his will.

6. On December 22, 2018, at 11:47 A.M., over two hours after the deadline for perfecting protective custody, Michael Andrick of Sweetser filled out a defective "Blue Paper" (34-B M.R.S. § 3863), omitting critical information required by the form, and failed to acquire judicial review and endorsement. Despite this, the Plaintiff's unlawful detention continued. Furthermore, Andrick wrongfully stated to the Plaintiff that he had in fact been "Blue Papered" when, legally and technically, he had not. Even if he had been, the "Blue Paper" would have been invalid due to the procedurally defective protective custody detention.

7. On December 22, 2018, Anthony Bock acted as the certifying examiner required for the defective "Blue Paper" filled out by Michael Andrick, directly participating in and perpetuating the Plaintiff's unlawful detention.

8. On December 22, 2018, at approximately 2:15 P.M., Plaintiff attempted to leave York Hospital, but staff informed him he could not leave because he was "Blue Papered," although he technically and legally should have been free to go.

9. On December 22, 2018, the York Police Department arrested the Plaintiff and returned him to York Hospital, continuing his unlawful detention.

10. On December 23, 2018, Amanda Hall filled out an untimely "Blue Paper" and attained judicial review and endorsement, continuing the unlawful detention despite the clearly defective procedure.

11. On December 23, 2018, at approximately 12:45 P.M., Janine Ward, acting as a certifying examiner, endorsed the untimely "Blue Paper" initiated by Amanda Hall.

12. On December 23, 2018, at approximately 12:53 P.M., John Doe 1, a Maine State Superior Court Judge, reviewed and endorsed the untimely "Blue Paper" initiated by Amanda Hall and certified by Janine Ward. At the time of filing, it is unclear whether John Doe 1 failed to uphold his non-judicial, meaning administrative and/or ministerial, duty to ensure procedural compliance, or if John Doe 1 was presented with an inaccurate chain of custody by the applicant.

13. On December 23, 2018, at approximately 12:55 P.M., Janine Ward signed the transfer order from York Hospital to Southern Maine Healthcare, perpetuating the Plaintiff's unlawful detention.

14. On December 23, 2018, American Ambulance transferred the Plaintiff to Southern Maine Healthcare, perpetuating the unlawful detention and unjustly enriching American Ambulance in the process.

15. On December 24, 2018, at approximately 11:00 A.M., Doctor Mularkey of Southern Maine Healthcare endorsed the "24-Hour Certificate" examination required by Maine law, certifying and continuing the Plaintiff's unlawful detention despite clear procedural defects.

16. Before or on December 24, 2018, when the required 24-Hour Examination completed by Dr. Mularkey was filed with the court, John Doe 1, a Maine Superior Court Judge, had an administrative and/or ministerial duty to ensure procedural compliance, and a mandate from the Maine Legislature to order the Plaintiff promptly released upon detecting noncompliance. At the time of filing, it is unclear whether John Doe 1 failed to uphold this duty or whether John Doe 1 was not presented with an accurate chain of custody by the applicant.

17. On December 26, 2018, Todd Pravatt, acting as "Commissioner's Designee," endorsed and filed the "White Paper" (34-B M.R.S. § 3864) application for involuntary commitment and hearing, at least 24 hours, and possibly close to 48 hours, late even if the original protective custody and required "Blue Paper" had been executed lawfully. If the protective custody procedure had been followed and perfected starting with the Plaintiff's original detention on December 21, 2018, the period for filing the "White Paper" application would have expired at approximately 3:25 P.M. on December 24, 2018.

18. On December 26, 2018, Attorney Lindsey Allen was appointed as counsel for the Plaintiff but failed to review the procedural history, which was clearly defective. Attorney Allen did not move for the Plaintiff's release despite the clear procedural violations.

19. On December 26, 2018, Nancy Nielson affected service on the Plaintiff's younger sister, Kate-Lynn Ayer. This created an obvious conflict of interest because the Plaintiff's sister was an employee of Southern Maine Healthcare at the time. This could also be construed as a form of

duress or coercion for both Kate-Lynn Ayer and the Plaintiff. This clear failure of service violated the Plaintiff's right to due process. The attestation of service by Nancy Nielson was submitted to the State Court as part of the documentation required by statute to initiate an involuntary commitment hearing.

20. On December 27, 2018, the Plaintiff delivered to the nurse's station on the psychiatric ward where he was held against his will at Southern Maine Healthcare, what was effectively a federal habeas corpus petition, which is his clearly stated right under 34-B M.R.S. §3804. On its face, the petition was obviously intended to be filed in Federal Court. The nurses and other staff and administration at Southern Maine Healthcare failed to file the habeas corpus petition in the proper venue in a prompt fashion. Instead, the Plaintiff's habeas corpus petition was filed in the improper venue of Biddeford District Court on January 3, 2019—seven days late.

21. On January 3, 2019, Tammy Marchand, a clerk at Maine District Court in Biddeford, failed in her non-judicial, meaning ministerial and/or administrative duty, to redirect the Plaintiff's federal habeas corpus complaint to the Federal Court in Portland, Maine.

22. On January 4, 2019, the Plaintiff met with Constance Jordan of Behavioral Health Resources of Maine at her request for the required examination preceding an involuntary commitment hearing.

23. On January 7, 2019, Constance Jordan acted as an independent examiner, filed an examination report with the court, and included by law with the application for involuntary commitment. She stated in her report a flawed timeline of events, specifically the timeline relating to the initial time of custody. This constructively masked the flaws in the protective custody procedure, rendering the entire detention unlawful.

24. Before or on January 8, 2019, Judge Michael P. Cantara had a non-judicial, meaning ministerial and/or administrative duty under the Supremacy Clause of the United States Constitution to yield to federal jurisdiction invoked by the Plaintiff's federal habeas corpus petition and redirect the Plaintiff's misfiled habeas corpus petition to Federal Court. To wit, until a Federal Judge or appropriate judicial officer of the Federal Court for the District of Maine had reviewed the Plaintiff's case, Judge Cantara lacked jurisdiction to commence or rule in the state involuntary commitment proceeding.

25. Before or on January 8, 2019, Judge Michael P. Cantara had a non-judicial, meaning ministerial and/or administrative duty to review the procedural history of the case for legal compliance. He was further mandated by the Maine State Legislature to release the Plaintiff immediately upon detecting procedural noncompliance evident in the docket file and required filings.

26. By January 8, 2019, the Plaintiff had been held unlawfully for 13 days of the maximum 14 days allowable under Maine law if the December 26, 2018, "Blue Paper" had been lawfully

instituted. However, the detention was 15 days in actuality, as the initial protective custody was procedurally defective. This created another clear defect in the chain of custody.

27. On January 8, 2019, at approximately 2:30 P.M., a hearing was held pursuant to 34-B M.R.S. §3864. Despite the several procedural errors rendering the hearing unlawful and untimely, the Plaintiff was involuntarily committed to Riverview Psychiatric Center in Augusta, Maine.

28. On January 10, 2019, North East Mobile Health Services transferred the Plaintiff to Riverview Psychiatric Center, perpetuating the unlawful detention and unjustly enriching North East Mobile Health Services in the process.

29. On January 10, 2019, at approximately 2:00 P.M., Olena Zakharova endorsed a "Capacity Certification," asserting that the Plaintiff lacked the ability to give informed consent and required medical treatment.

30. On January 10, 2019, at approximately 3:00 P.M., George Costin of Riverview Psychiatric Center signed a certificate upon the Plaintiff's arrival, further perpetuating the broken chain of custody.

31. On January 14, 2019, at approximately 9:30 A.M., John Doe 2 reviewed the unlawful re-certification of the Plaintiff endorsed by George Costin in John Doe 2's role as Utilization Review Nurse.

32. On January 24, 2019, at approximately 2:05 P.M., Olena Zakharova re-certified the Plaintiff's involuntary commitment.

33. On January 28, 2019, John Doe 2 reviewed the unlawful re-certification of the Plaintiff endorsed by Olena Zakharova in John Doe 2's role as Utilization Review Nurse.

34. On February 7, 2019, Attorney Julie-Ann Blanchard was appointed counsel for the Plaintiff by the State Court, but failed to review the clearly defective procedural history. Attorney Blanchard should have moved for the Plaintiff's release at that time.

35. On February 26, 2019, at approximately 11:00 A.M., Doctor John Doe 3 re-certified the Plaintiff's unlawful involuntary commitment.

36. On February 27, 2019, John Doe 2 reviewed the unlawful re-certification of the Plaintiff endorsed by John Doe 3, a physician, in John Doe 2's role as Utilization Review Nurse.

37. On March 5, 2019, the Plaintiff's 74 days of unlawful detention ended.

**Attending Physicians and Supervising Practitioners**

38. As part of the Plaintiff's care team, Ryan Jackson, M.D. of York Hospital signed off on records describing the Plaintiff's condition during his stay and failed to address the Plaintiff's legal concerns or procedural defects apparent in the records.

39. Renee Sarett, M.D. of York Hospital documented the Plaintiff's pending transfer to Southern Maine Healthcare and failed to address the Plaintiff's allegations of unlawful detention or procedural irregularities.

40. Joanna E. Gratton, M.D. of Southern Maine Healthcare, as an attending physician, had access to the Plaintiff's medical records, including his abuse allegations and legal concerns, yet failed to take corrective action or report these issues.

41. As an attending physician at Riverview Psychiatric Center, Sarah Street Taylor, N.P. failed to identify or address procedural and statutory violations affecting the Plaintiff.

42. As the Plaintiff's primary care provider during his detention at Riverview Psychiatric Center, George Davis, N.P. failed to address concerns regarding the Plaintiff's procedural history and allegations of abuse.

43. Daniel Filene, M.D. of Riverview Psychiatric Center signed certifications prolonging the Plaintiff's detention without addressing documented procedural flaws or the Plaintiff's claims of abuse.

44. John Grandy, Psychiatrist at Riverview Psychiatric Center participated in the Plaintiff's care without addressing or reporting the Plaintiff's legal concerns or procedural irregularities.

45. Dr. Edward A. McCarthy, Jr., as a physician at Southern Maine Healthcare, examined the Plaintiff and was aware of his abuse allegations. Despite this knowledge, Dr. McCarthy failed to act on or report these claims, contributing to the continuation of the Plaintiff's unlawful detention.

46. Dr. Nadir Behrem, as a psychologist at Riverview Psychiatric Center, examined the Plaintiff and was aware of his abuse allegations. Dr. Behrem took no action to address or report these claims, perpetuating the Plaintiff's unlawful detention.

**Support Staff and Other Healthcare Providers**

47. Nichole Yeaton, R.N. of York Hospital, as a nurse at York Hospital, had access to records documenting the Plaintiff's complaints but failed to report or act on them.

48. Jennifer A. Burgess, R.N. of Southern Maine Healthcare, documented the correct date of the Plaintiff's accident, which was inconsistently reflected elsewhere, but failed to report irregularities in the records.

49. Keli M. Wedgewood, LCSW of Southern Maine Healthcare, met with the Plaintiff during his detention but failed to address his legal concerns or report his allegations of abuse.

50. Janina M. Davis, F.N.P. of Southern Maine Healthcare, evaluated the Plaintiff and documented his condition but failed to act on his claims of unlawful detention.

51. Elaine M. Madden, R.N. of Southern Maine Healthcare, documented the Plaintiff's concerns regarding the legality of his detention but failed to escalate or report the issue.

52. Jennifer M. O'Conor, N.P. of Southern Maine Healthcare, evaluated the Plaintiff and documented his condition but failed to act on clear allegations of abuse and procedural flaws.

53. Margaret V. Scott, LCSW of Southern Maine Healthcare, met with the Plaintiff and documented his claim that he was being held unlawfully but took no action to escalate or report these concerns.

54. Karen L. Unglaub, R.N. of Southern Maine Healthcare, administered medication to the Plaintiff on the day of his court hearing but failed to address his procedural concerns or allegations of abuse.

55. Kiely L. Foley, PMHNP of Southern Maine Healthcare, as a psychiatric nurse practitioner, had access to the Plaintiff's records and took no action to investigate or address abuse allegations or legal concerns.

56. Nathan Pineau, N.P. of Riverview Psychiatric Center, documented inaccurate statements in the Plaintiff's records that contradicted toxicology results, perpetuating misdiagnosis and detention.

57. As part of the Plaintiff's care team, Jason Grundstrom-Whitney, S.A.C. of Riverview Psychiatric Center, failed to act on documented procedural issues and abuse allegations.

58. As part of the Plaintiff's care team, Leanna Snowman, L.S. of Riverview Psychiatric Center, failed to investigate or report his allegations of abuse or concerns about his detention.

**Analysis of Clinical Notes and Records**

**Absence of Objective Evidence of Mental Illness**

59. The clinical notes and records from all facilities involved in the Plaintiff's detention are bereft of objective evidence sufficient to justify a diagnosis of mental illness warranting involuntary commitment. Even a layperson reviewing these records would recognize the lack of substantive clinical data supporting such a diagnosis. Rather than providing clinical or diagnostic insights, the notes largely consist of:

60. Repetition of Events Related to the Car Accident: Notes frequently recount the Plaintiff's involvement in the car accident and subsequent evasion. The Plaintiff did, in fact, disrobe while fleeing, which could easily be misinterpreted. However, he has explained that after his vehicle crashed, he smelled gasoline and fire. He was wearing multiple layers of synthetic winter clothing, which he feared could ignite, prompting him to disrobe in a state of panic. His further panic upon the arrival of law enforcement, while unconventional, was a situational reaction rather than evidence of mental illness.

61. The Plaintiff's Refusal to Discuss the Car Accident: This is consistent with the Plaintiff's legal right to avoid self-incrimination while criminal charges were pending and does not constitute evidence of mental illness.

62. Irritability: The Plaintiff's irritability is a reasonable response to being held against his will, particularly given the demonstrably unlawful nature of his detention. Such a reaction cannot be used as evidence of mental illness.

63. Un-investigated Abuse Allegations: The Plaintiff repeatedly expressed concerns about ongoing domestic abuse, particularly financial exploitation. These allegations were universally dismissed as delusions without investigation, despite the legal obligation of healthcare providers to report such claims under Maine law (22 M.R.S. §3477).

64. Mischaracterization of Legal Assertions: The Plaintiff's statements about pursuing legal action against those involved in his detention and abuse were documented in clinical notes as though they were clinically significant. Rather than treating these declarations as rational and lawful assertions of his rights, healthcare providers framed them as evidence of mental illness. This mischaracterization contributed to the unjust continuation of the Plaintiff's detention and perpetuated the erroneous narrative of mental instability without any substantive clinical justification.

**Failure to Investigate Abuse Allegations**

65. Every healthcare provider who documented contact with the Plaintiff during his detention had a mandatory duty to report abuse allegations under 22 M.R.S. §3477. Had any of these individuals fulfilled their statutory obligation, an investigation would have been initiated, likely corroborating the Plaintiff's claims and demonstrating that his allegations were not delusional.

The failure to report these allegations compounded the procedural violations and further contributed to the Plaintiff's unlawful detention.

**Unlawful Use of Abuse Allegations to Justify Detention**

66. The Plaintiff's uninvestigated allegations of abuse were used as a basis for diagnosing him with delusional disorder and proceeding with involuntary commitment. This baseless diagnosis and subsequent commitment not only exacerbated the Plaintiff's distress but also perpetuated an unlawful detention. The procedural defects and lack of clinical evidence rendered this diagnosis and commitment fundamentally flawed.

**Clinical Notes as Evidence of Systemic Failures**

67. The clinical notes uniformly fail to address the Plaintiff's allegations of abuse or to reflect meaningful engagement with his legal concerns. This omission suggests systemic complacency, negligence, or possibly conspiracy on the part of the healthcare providers and administrators involved. The repetition of non-clinical observations, such as the Plaintiff's refusal to discuss the accident or his irritability, further underscores the absence of legitimate diagnostic criteria to justify the Plaintiff's detention.

**Reasonable Explanation for Behavior Mischaracterized as Mental Illness**

68. The Plaintiff's behavior during and after the car accident has been mischaracterized in the clinical notes as indicative of mental illness. The Plaintiff has provided a clear and reasonable explanation for disrobing after his vehicle crash: the smell of gasoline and fire caused him to

panic, fearing that his synthetic winter clothing might ignite. This situational behavior, while unconventional, is a rational response to the circumstances and cannot reasonably be construed as evidence of a psychiatric condition.

**Impact of Psychoactive Medications and Coercion at the State Hospital**

**Coerced Compliance with Diagnosis Due to Systemic Pressure**

69. After being transferred to Riverview Psychiatric Center, the Plaintiff, facing the weight of systemic failures and procedural violations, effectively abandoned efforts to contest the involuntary commitment. This shift in behavior was not indicative of genuine agreement with the diagnosis but rather a survival mechanism in the face of insurmountable institutional pressure. The Plaintiff understood that to challenge the diagnosis would likely prolong his detention, as the facility applied circular logic: compliance with the diagnosis and treatment was the only pathway to discharge. Any disagreement with the psychiatric assessment was treated as further evidence of mental illness, creating a no-win situation for the Plaintiff.

**Adverse Effects of Psychoactive Medications**

70. While detained at Riverview Psychiatric Center, the Plaintiff was placed on psychoactive medications that he states altered his personality in profound and negative ways. The Plaintiff reports experiencing changes that severely impeded his ability to advocate for himself or meaningfully participate in his defense. These medications were administered without his

informed consent, as the Plaintiff had been declared incompetent to make medical decisions—a declaration stemming from the procedurally flawed commitment process.

71. The use of these medications further highlights the systemic failures at play. Rather than addressing the root cause of the Plaintiff's distress—unlawful detention, un-investigated abuse allegations, and financial exploitation—the institution sought to manage the symptoms of his understandable frustration and anxiety through chemical means. This approach compounded the Plaintiff's suffering and further eroded his trust in the system.

**Institutional Conditioning to "Play Along"**

72. The Plaintiff's notes at Riverview Psychiatric Center reflect a shift in his approach: he appeared to conform to the expectations of the institution, "playing along" with the diagnosis and treatment process. This behavior was not a sign of mental illness but rather a pragmatic response to the circular logic applied to his detention. He recognized that dissent or non-compliance would only result in extended detention and harsher treatment. The Plaintiff's compliance was coerced by a system designed to prioritize administrative convenience over patient rights.

**Unlawful Use of Psychoactive Drugs as a Tool for Compliance**

73. The administration of psychoactive drugs, coupled with the procedural and clinical failures documented in this case, demonstrates a systemic disregard for the Plaintiff's rights. These medications, rather than addressing a legitimate medical condition, were used as a tool to suppress dissent and secure compliance with an unlawful and procedurally defective detention.

**Role of the Abuser in Perpetuating Detention and Exploitation**

74. As part of the events leading to the Plaintiff's detention, the Plaintiff's abuser Richard F. Stickney, Jr., the Plaintiff's biological father, deliberately misrepresented his mental health and behavior to healthcare providers, either directly or indirectly. The abuser also failed to disclose critical information regarding the Plaintiff's financial and inheritance-related concerns, further reinforcing a narrative of delusion. These omissions and misrepresentations were instrumental in justifying the Plaintiff's detention, which directly benefited the abuser by preventing the Plaintiff from addressing ongoing financial exploitation and other abuse.

**Inheritance and Financial Exploitation Allegations**

75. The Plaintiff reasonably believes that he is entitled to significant inheritance rights that have been unlawfully concealed or diverted by the abuser and other family members. The Plaintiff has identified patterns of financial exploitation and questionable transactions that suggest a coordinated effort to exclude him from his rightful inheritance. During his detention, the Plaintiff repeatedly raised these concerns, but they were summarily dismissed as delusional without investigation.

76. The Plaintiff further alleges that his detention, and the subsequent barriers it created, served to shield the abuser and others from scrutiny while depriving him of the opportunity to assert his rights. These actions, taken together, point to a broader conspiracy to exploit the Plaintiff and deny him access to resources and justice.

**Inference of Conspiracy**

77. The Plaintiff asserts that the widespread and consistent failures by numerous individuals and institutions to fulfill their legal and ethical obligations—despite the procedural violations, clear statutory mandates, and the Plaintiff's repeated assertions of abuse—give rise to a strong inference of conspiracy.

78. The pattern of conduct among the defendants, including their collective disregard for procedural safeguards, the lack of investigation into abuse allegations, and the perpetuation of an unlawful detention, cannot reasonably be attributed to mere negligence or coincidence. Each defendant's role, as described in the procedural and factual history, reflects a failure to act in ways that were clearly required under state and federal law.

79. This inference of conspiracy is further bolstered by the alignment of these failures with the interests of individuals and institutions seeking to deprive the Plaintiff of his inheritance and financial rights. These coordinated failures contributed to the Plaintiff's unlawful detention and exacerbated the abuse and exploitation he continues to endure.

80. At this stage, the Plaintiff asserts that the totality of these failures warrants discovery to uncover the extent of coordination among the defendants and any co-conspirators. The Plaintiff reserves the right to amend his claims as further evidence of the conspiracy emerges.

## NECESSITY OF TOLLING, STAY, AND RESOLUTION OF RELATED STATE JURISDICTIONAL MATTERS

The Plaintiff asserts that this federal proceeding must be equitably tolled and stayed to address critical state-exclusive jurisdictional matters that directly impact his ability to pursue justice in this case. These include obtaining protection from abuse and harassment orders against the abuser and any co-conspirators, initiating and resolving probate matters, and filing a Rule 60(b) motion to vacate the void judgment resulting from the unlawful involuntary commitment.

1. Protection Orders: The Plaintiff requires protection from ongoing domestic abuse and harassment, which continues to deprive him of the stability and resources necessary to participate meaningfully in these proceedings. Securing these orders is an essential step to prevent further interference in his pursuit of justice and ensure his safety.

2. Probate and Financial Matters: The Plaintiff alleges significant financial exploitation and concealment of his inheritance rights, which need to be reviewed by independent probate professionals. Resolving these issues is critical to restoring his financial stability and addressing the abuse that contributed to his detention.

3. Rule 60(b) Motion: The Plaintiff intends to file a Rule 60(b) motion in state court to vacate the void judgment from the unlawful involuntary commitment proceeding. This judgment continues to have adverse effects on his rights and reputation, and addressing it is fundamental to achieving justice.

These state matters are intrinsically linked to the Plaintiff's federal claims. Until they are resolved, the Plaintiff faces significant inequities that prejudice his ability to proceed in this case. The ongoing abuse and its consequences create an unjust advantage for the defendants, whether or not they are directly involved in the abuse, and undermine the fairness of these proceedings.

The Plaintiff respectfully requests that the Court toll the statute of limitations for this case and issue a stay of these proceedings until the state jurisdictional matters are fully resolved. This relief is necessary to ensure that the Plaintiff can address the abuse and financial exploitation, restore his rights, and litigate this case on equal footing with the defendants.

Also, the abuse limits the Plaintiff's resources and ability to secure professional legal counsel, perpetuating an unjust advantage for the defendants in this matter.

The Plaintiff intends to hire professional counsel as soon as he has the resources to do so and is taking this action in good faith to preserve viable claims before the expiration of the statute of limitations. This complaint represents the Plaintiff's best effort under challenging circumstances, as the abuse he continues to endure severely limits his ability to mount a full and proper legal case.

**CLAIMS FOR RELIEF**

**Count I: Violation of Due Process Rights Under the Fourteenth Amendment (42 U.S.C. § 1983)**

Against all Defendants:

1. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

2. The Plaintiff's detention and subsequent involuntary commitment were carried out in violation of procedural and substantive due process guarantees under the Fourteenth Amendment to the U.S. Constitution.

3. Defendants, acting under color of state law, failed to comply with statutory and constitutional requirements in initiating, reviewing, and perpetuating the Plaintiff's detention.

4. The numerous procedural defects, including the mishandling of protective custody, untimely and defective "Blue Paper" filings, and failure to adhere to statutory deadlines, violated the Plaintiff's constitutional right to liberty without due process of law.

**Count II: Conspiracy to Deprive Civil Rights Under 42 U.S.C. §§ 1983, 1985**

Against all Defendants:

1. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

2. Defendants conspired to deprive the Plaintiff of his constitutional rights by perpetuating his unlawful detention despite numerous clear procedural defects and statutory violations.

3. This conspiracy included the submission of false or incomplete documents, the failure to act on readily apparent procedural flaws, and collective inaction in addressing the illegality of the Plaintiff's detention.

4. Defendants' actions, taken in concert or with deliberate indifference, deprived the Plaintiff of equal protection and due process rights guaranteed by the Fourteenth Amendment.

**Count III: Unjust Enrichment (State Law)**

Against York Hospital, Southern Maine Healthcare, MaineHealth, American Ambulance, and North East Mobile Health Services:

1. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

2. The Plaintiff incurred financial costs for services rendered by these institutions in furtherance of his unlawful detention.

3. Payment was extracted for services provided under unconstitutional and procedurally defective circumstances.

4. Retaining these payments constitutes unjust enrichment under state law, as the services were performed in violation of the Plaintiff's legal and constitutional rights.

**Count IV: Excessive Detention and Deprivation of Liberty Under the Fourth Amendment (42 U.S.C. § 1983)**

Against York Police Department and York Hospital Staff:

1. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

2. The Plaintiff's continued detention beyond the statutory 18-hour protective custody limit constituted an unlawful seizure under the Fourth Amendment to the U.S. Constitution.

3. Defendants acted without proper judicial authorization and failed to release the Plaintiff in accordance with statutory and constitutional mandates, depriving him of his right to be free from unlawful detention.

**Count V: Equal Protection Violation Under the Fourteenth Amendment (42 U.S.C. § 1983)**

Against all Defendants:

1. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

2. Defendants failed to provide the Plaintiff with the same procedural protections afforded to others in similar situations.

3. The procedural and substantive violations, as well as the failure to act on the Plaintiff's abuse allegations, represent discriminatory treatment in violation of the Equal Protection Clause of the Fourteenth Amendment.

**Count VI: Violation of First Amendment Rights (42 U.S.C. § 1983)**

Against: Southern Maine Healthcare and Tammy Marchand, District Court Clerk

1. Plaintiff incorporates by reference all preceding paragraphs as though fully set forth herein.

2. The Plaintiff exercised his First Amendment right to petition the government for redress of grievances by submitting a habeas corpus petition challenging his unlawful detention.

3. Defendants, acting under color of state law, obstructed the Plaintiff's ability to exercise this right by failing to process, file, or redirect his petition in a timely and appropriate manner.

4. Southern Maine Healthcare staff delayed the filing of the petition and failed to ensure it was directed to the proper venue.

5. Tammy Marchand, in her capacity as Clerk at the Biddeford District Court, failed to forward the Plaintiff's petition to Federal Court, depriving him of timely access to judicial review.

6. These actions violated the Plaintiff's First Amendment right to petition the government and denied him meaningful access to the courts.

7. As a direct result of these violations, the Plaintiff suffered prolonged unlawful detention and emotional distress.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

1. Declaratory Judgment: A declaration that the actions and omissions of the Defendants violated the Plaintiff's rights under the Constitution and laws of the United States.

2. Injunctive Relief: An injunction:

   A. Prohibiting Defendants from further violating the Plaintiff's constitutional rights.

   B. Requiring the Defendants to implement policies and procedures to prevent future violations similar to those alleged in this Complaint.

3. Compensatory Damages: Award compensatory damages in an amount to be determined at trial for the harm suffered by the Plaintiff, including emotional distress, pain and suffering, and any economic damages incurred.

4. Punitive Damages: Award punitive damages against the individual Defendants to deter future violations of constitutional rights.

5. Unjust Enrichment: Restitution for any payments made by the Plaintiff to York Hospital, Southern Maine Healthcare, and any ambulance services for care and transport provided during the period of unlawful detention.

6. Attorney's Fees and Costs: Award the Plaintiff reasonable attorney's fees, costs, and expenses pursuant to 42 U.S.C. § 1988 and any other applicable law.

7. Equitable Tolling and Stay:

A. Toll the statute of limitations for claims not yet filed until the Plaintiff's domestic abuse has been addressed, and professional legal representation is secured.

B. Stay these proceedings pending the resolution of the following state court matters:

i. The Plaintiff's anticipated Rule 60(b) motion in state court to vacate the void judgment resulting from the unlawful involuntary commitment proceeding.

ii. The Plaintiff's efforts to secure protection from abuse and harassment orders against the alleged abuser and any co-conspirators.

iii. The investigation and resolution of probate matters, including an independent review of alleged fraud and mismanagement of the Plaintiff's inheritance rights.

8. Other Relief: Grant such other and further relief as the Court deems just and proper.

**JURY DEMAND**

The Plaintiff demands a trial by jury on all issues triable by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,

Richard F. Stickney III
Pro Se Plaintiff
4 Birch Hill LN.
APT #1
Saco, ME 04072
207-710-6072
stickneyiii@gmail.com

Date: December 20, 2024